UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DENZIL BELL,                                      Case No. 2:23-cv-00071

            Plaintiff,                      Hon.  Hala Y. Jarbou
                                      Chief U.S. District Judge

     v.

SARAH SCHRODER, et al.,

            Defendants.
_____/

## REPORT AND RECOMMENDATION

### I.  Introduction

This Report and Recommendation (R. & R.) addresses Defendants' motion for summary judgment.   (ECF No. 61.)

State Prisoner Denzil Bell, who is represented by counsel, filed a civil complaint asserting an Eighth Amendment claim pursuant to 42 U.S.C. § 1983, and a gross negligence claim pursuant to state law.   (ECF No. 1.)   The four remaining Defendants are Alger Correctional Facility (LMF) Warden Schroeder, Correction Officer (CO) Aaron, CO Dementer and Prison Counselor (PC) Salo.[1]   (ECF No. 32.)

Bell says that while he was incarcerated at LMF, he shared a cell with Prisoner Jerry Edwards.   Bell says that he requested a move to a different cell because he

_____

[1]    The Court previously dismissed four Defendants due to Plaintiff's failure to exhaust his administrative remedies with respect to his claims against them.   (ECF No. 32.)
     It should also be noted that Plaintiff's complaint (ECF No. 1, PageID.4) identified PC Salo as a CO.

could not get along with Edwards.  (*Id.*, PageID.6.)  Bell says that he broke his hand in a fight with Edwards on May 4, 2020.  (*Id.*)  Bell says that he sent numerous written requests (kites) and made oral statements regarding his risk of harm from his cellmate Edwards.  (*Id.*, PageID.7.)  Bell's complaint does not specify dates of these communications, nor does it identify specific recipients of his communications. He simply alleges that he communicated with Defendants.  (*Id.*)  Bell further alleges that Defendants were "either verbally or by 'kite'" informed that he faced a substantial risk of harm.  (*Id.*)  Despite Bell's alleged requests to move to a new cell, he was not moved away from Edwards.

Bell alleges that on May 31, 2020, he was awakened by Edwards after Edwards began striking him with a sock with a padlock inside.  (*Id.*, PageID.7-8.)  Bell says he awoke to find that he was tied to his bed frame, and that Edwards had cut, burned, and mutilated him with improvised weapons.  (*Id.*, PageID.8.)  Bell says he was able to untie himself and fight back until members of the prison staff responded.

Defendants argue that they are entitled to summary judgment on Bell's Eighth Amendment claims because they were not deliberately indifferent to a serious risk of harm and are further entitled to qualified immunity from liability.   A review of the records before the Court demonstrates that Bell has not shown (1) that he was particularly vulnerable, (2) that Edwards was particularly threatening or violent, or (3) that Bell's communications with the four remaining Defendants were sufficient to put them on notice that he faced a substantial risk of serious injury as a result of sharing a cell with Prisoner Edwards.

2

Thus, the undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment because no genuine issue of material fact exists on Bell's Eighth Amendment failure to protect claim.    It is further recommended that the Court decline to exercise supplemental jurisdiction over Bell's state law gross negligence claim.

## II.   Rule 56(c) Materials Submitted by the Parties

## A. Bell's Deposition

The allegations in Bell's complaint are set forth above.    In his deposition, Bell testified that he initially asked to be moved from General Population (GP) to the Cedar Unit in LMF[2] because the Cedar Unit "is a much better unit to be in, more laid back, generally."   (ECF No. 62-3, PageID.309 (Bell deposition transcript).)   Bell stated that after he arrived in Cedar Unit, he could ask to move back to the GP but that could "take several weeks."   (*Id*.)   Bell says he thinks he asked someone if he could return to the GP between October 2019 and June 1, 2020, but he does not remember.   (*Id*., PageID.309-310.)   Bell met Edwards a couple of months before they became roommates in the Cedar Unit.   (*Id*., PageID.309.)   He did not have any problems with Edwards.   (*Id*.)

Bell says that after the altercation on May 4, 2020, he asked CO Aaron and CO Dementer to move him to a different cell and "also kited administration to try to get moved out of that cell".   (*Id*., PageID.310.)   Bell says that he and Edwards got along

---

[2]    Plaintiff's complaint asserts that the events in this case took place in the Pine Unit.   (ECF No. 1, PageID.2-3.)

3

until May 4, 2020, when "we got into an argument, and it escalated, and we fought." (*Id.*)   Bell asserts that he broke his hand during the fight.   (*Id.*)   Once they calmed down, Bell thought everything was fine or at least "hoped that we were."   (*Id.*)

Days later, Bell kited healthcare after realizing "there was a small break." (*Id.*, PageID.311.)   Bell says that on the day he visited an orthopedic surgeon, he told an unidentified deputy warden that he and his cellmate had been in a fight.   (*Id.*) Bell testified that this was the <u>first time</u> that he told an MDOC official that he had gotten into a fight.[3]   Bell explained his reasoning for not initially informing anyone about the fight:

> I really wasn't sure what I was going to do about it.   I wasn't sure if I was just going to, you know, see it -- see if we would be able to continue to lock together or if I was going to try to move.   I kind of felt like if my hand was broken, I might have to, you know, get moved.   I was waiting to see if my hand was really broken or if it was just swollen for some reason. You know, it took me a -- a few days to, kind of, decide what I was going to do.

(*Id.*, PageID.312.)

Bell testified that he remained "cordial" with Edwards until May 31, 2020. (*Id.*)

Bell says that he wrote a kite to Warden Schroeder explaining that he had gotten into a fight and requesting "to get moved from the situation, just trying to do the right thing to extricate myself from the situation."   (*Id.*)   Bell says that he sent the kite sometime between the first fight on May 4, and the May 31 incident.   (*Id.*)

---

[3]    Medical records provided by Defendants indicate that Bell was seen by the orthopedic surgeon on May 19, 2020.  (ECF No. 62-4, PageID.324.)  That report indicates that Bell said he broke his hand when he punched a wall.  (*Id.*)

4

Bell says he never spoke with Warden Schroeder and has no way of knowing if she ever received the kite.   (*Id.*)

After Bell "went to medical and realized that [his] hand was broken", he decided to speak with CO Dementer because he knew "he had done friendly moves for people." (*Id.*, PageID.313.)   Bell says that although he does not remember exactly what he told CO Dementer, he informed him about the fight and requested a move to another cell.  (*Id.*, PageID.314.)   Bell says that he asked him again "a few times" about moving to different cell, but CO Dementer was noncommittal by responding only "We'll see."   (*Id.*)

Bell says that he next spoke with CO Aaron a couple of days after speaking with Dementer.  (*Id.*)   Bell says that he told CO Aaron about the fight and that he wanted to do the right thing and move to another cell.  (*Id.*)   Bell says CO Aaron told him that there were no open bunks in the Unit and that "We'll see, I – I'll have to talk with the PC and we'll see – we'll see." (*Id.*, PageID.315.)   Bell says he followed up with CO Aaron and was told "We'll see" or "try to see" or "maybe."  (*Id.*) Bell believes that CO Aaron told him to write the Warden to try to expedite the process.  (*Id.*)

Bell says that he "might have" sent a kite to CO Aaron or PC Salo.  (*Id.*)

Bell does not recall having a face-to-face conversation with PC Salo.  (*Id.*) Bell says that the kite he may have written and sent to PC Salo informed him of the fight and his request for a transfer – "telling them [all] the same stuff."  (*Id.*)   Bell stated that when you kite a PC, you get called out to talk to the PC, but he does not

remember whether he spoke with PC Salo.    (*Id.*, PageID.316.)    Bell further stated

that "I don't know if I kited [PC Salo] multiple times."    (*Id.*, PageID.317.)    Bell does

not specifically remember what he included in any of the kites.    (*Id.*, PageID.316.)

Bell says he went to bed drunk after drinking homemade alcohol before the

May 31, 2020, morning incident.    (*Id.*, PageID.318.)    He says that on May 31, 2020,

he awoke after being hit, and he noticed that his arms and legs were tied down on the

bed.    (*Id.*, PageID.319.)    He yelled at his cellmate Edwards, who was being violent,

to "get off me."    (*Id.*)    Bell says Edwards was hitting him with a lock in a sock.    (*Id.*)

Edwards tattooed the word "Cho" on Bell's forehead which Bell explained was short

for child molester.    (*Id.*)    Edwards burned Bell's body using a paperclip and cut him

with a broken piece from a fingernail clipper.    (*Id.*, PageID.319-320.)    After

Edwards left the cell to perform his job pushing the breakfast food cart, Bell was able

to free himself before Edwards returned to the cell.    (*Id.*, PageID.320.)    Edwards

returned to the cell and then a few minutes later the cell door opened for breakfast.

Bell says he knew that if he fought Edwards in the unit hallway, the guards would

no longer allow them to room together.    (*Id.*)

## B. Bell's Grievance

Bell submitted a Step I grievance on <u>June 2, 2020</u> that offers a different version

of the dates he allegedly contacted each Defendant.[4]

---

[4]    This grievance was already part of the record submitted by Defendants in their
earlier motion for summary judgment on exhaustion.    In summary, Bell submitted
this Step I grievance on June 2, 2020.    He claimed that he sent kites regarding his
situation with Edwards to PC Salo and Warden Schroeder on May 9 and May 13,
respectively.    This grievance was rejected as untimely, and the rejection was upheld



(ECF No. 64-3, PageID.455.)

### C. Medical Records from May 19, 2020

Bell was taken to the Advanced Center For Orthopedics and Plastic Surgery on May 19, 2020, where he was diagnosed with a right-hand fracture. During his visit, Bell stated that "he punched a wall out of anger and frustration." (ECF No. 62-4, PageID.324.) A portion of the report is shown below.

on appeal.    (ECF 25-3, PageID.116-120.)

**ADVANCED CENTER FOR ORTHOPEDICS AND PLASTIC SURGERY**
Upper Peninsula Medical Center
1414 W. Fair Ave Suite 190 Marquette, MI 49855
Appts: (906) 225-1321 Toll Free: (800) 462-6367

Patient                Patient Name:   Bell, Denzil              DOB: ▮▮▮▮▮▮
ID: 96263067

DOS: 05/19/2020                                    Clinic Location: ACO

REASON FOR CLINIC VISIT: Patient is a 27-year-old otherwise healthy right-hand dominant
white male, prison inmate, who was seen today for a right fifth metacarpal base fracture that
occurred on May 10, 2020. He states that he punched a wall out of anger and frustration while
at prison and noted immediate pain at the base of his right fifth metacarpal. He had x-rays
taken at the local hospital and referred here for further evaluation.

(*Id.*)

### D. Critical Incident Report

Defendants submitted a 43-page Critical Incident Report (CIR) produced after

the incident on May 31, 2020.   (ECF No. 62-5.)   The CIR begins with a description

of an altercation between Bell and Edwards observed by COs.   (*Id.*, PageID.324.)

The CIR states that Bell, who had a hard cast on his right forearm and hard, was

striking Edwards, but Edwards was not fighting back.   (*Id.*)   The CIR notes that

Bell was taken to a hospital to treat his injuries.   (*Id.*, PageID.326.)   Bell was placed

in temporary segregation and issued a Class I assault and battery misconduct ticket.

(*Id.*, PageID.337.)   Edwards was placed in temporary segregation for a Protective

Segregation Investigation.   (*Id.*, PageID.324.)

The CIR includes a series of photos of Bell's injuries as well as the padlock and

bloody sock.   (*Id.*, PageID.329-336.)   The CIR also included a Prisoner Injury

Report, portions of which is shown below, that documented Bell's explanation for what happened as well as his injuries.



. . . .



. . . .



9

(*Id.*, PageID.339.)

MDOC Sergeant Brinkman interviewed Bell for purposes of the Prison Rape Elimination Act (PREA.)    (*Id.*, PageID.338.)    Bell said that his altercation with Edwards was not sexual in nature.    (*Id.*)

The CIR indicates that Edwards was placed in protective segregation.    (ECF No. 62-5, PageID.326.)    After the cell was searched and a sock with a padlock inside was found, Edwards received a Class I Misconduct ticket for possession of a weapon. (*Id.*, PageID.343.)

CO Fielding witnessed Bell striking Edwards after the two exited their cell on May 31, 2020.    CO Fielding authored a Critical Incident Participant Report describing the incident:

**Incident Description**

From the unit commons area while monitoring prisoners picking up their breakfast trays I observed prisoner Edwards #405149 exit cell 141, then prisoner Bell #770562 exit cell 141 right behind him and then start swinging both of his arms with closed fists striking Edwards in the back of the head and upper torso area.  Prisoner Edwards then put his hands on top of his head in a defensive posture, then both prisoners went to the ground.  I pulled my taser and gave orders to stop fighting, then Officer Heyrman grabbed prisoner Bell to restrain him on the floor.  I then put handcuffs on Edwards and escorted him to the Cedar unit commons area where I handed him off to Officer Olsen and Officer Post.

(ECF No. 62-5, PageID.359.)

Bell was charged with a Class I misconduct for assault and battery.    (*Id.*, PageID.337.)

**E. Bell's Misconduct Summary Report**

Bell's Misconduct Summary Report indicates that he was convicted on the assault and battery misconduct ticket.

**Michigan Department of Corrections**
Offender Management System
**Misconduct Summary Report**

| Offender Num: 770562 | Offender Name: BELL, DENZIL | | | | Location: ICF | | |
|---|---|---|---|---|---|---|---|
| MCR No. | Violation Date/Time | Misconduct Charge Code | Verdict/ Finding | Reduced/ Elevated | Hearing Date | Hearing Location | Hearing Officer |
| 46 | 12/20/2021/18:05 | 043 - Substance Abuse - Drug Test Refusal | Guilty | Neither | 1/5/2022 | LMF | 071 |
| | | 420 - DISOBEYING A DIRECT ORDER | Guilty | Neither | | | |
| 44 | 08/17/2021/23:40 | 034 - Substance Abuse - Alcohol | Guilty | Neither | 8/20/2021 | LMF | 048 |
| 43 | 08/17/2021/19:37 | 014 - Fighting | Guilty | Neither | 8/20/2021 | LMF | 048 |
| 42 | 06/17/2021/10:35 | 012 - Threatening Behavior | Guilty | Neither | 6/28/2021 | LMF | 072 |
| 41 | 04/02/2021/06:35 | 426 - INSOLENCE | Guilty | Neither | 4/8/2021 | LMF | 099 |
| 40 | 11/17/2020/19:30 | 427 - DESTRUCTION/MISUSE PROPERTY | Guilty | Neither | 11/18/2020 | LMF | 099 |
| 39 | 11/14/2020/11:28 | 008 - Assault And Battery- Staff Victim | Guilty | Neither | 11/18/2020 | LMF | 040 |
| | | 426 - INSOLENCE | Guilty | Neither | | | |
| 38 | 06/01/2020/11:45 | 030 - Possession Of Dangerous Contraband | Guilty | Neither | 6/10/2020 | LMF | 048 |
| 37 | 05/31/2020/06:13 | 007 - Assault And Battery- Prisoner Victim | Guilty | Neither | 6/10/2020 | LMF | 048 |

(ECF No. 62-14, PageID.414.)

### F. MSP Investigation

The May 31 incident was investigated by the Michigan State Police.   (ECF
No. 62-6.)   The investigation determined that no sexual assault had taken place.
(*Id*., PageID.369.)   When interviewed, Edwards gave an account that differed
substantially from the version of events alleged by Bell.   Edwards denied that he
had assaulted Bell.   Edwards stated that Bell made up the entire incident to get pain
medication and to transfer to a new facility.   The Investigation Report described this
interview as follows:

Edwards told us that he believes Bell wants to ride out to another prison and that this whole incident is made up. He said that Bell does not like it there. He said whatever he has going on is a ploy. Edwards said that Bell broke his hand a week ago so he could get pain meds and get transferred to another facility. Edwards advised he never assaulted Bell.

Edwards said that a week ago he gave Bell some of his clothes since he is leaving. This morning, he noticed his lock was missing off his locker but he told him that he could have it so he assumed he grabbed it. He saw his t shirt he gave him laying there and saw it had paint on it and asked Bell about it. He asked Bell if he spilled paint on it and Bell said he did and that he "was into everything last night." Bell also said that he was surprised Edwards did not wake up during the night. Edwards advised he balled the shirt up and threw it on the ground and told Bell it was there when he needed it. Edwards said that only he and Bell where in the cell from approximately 1900 until breakfast. Edwards said the last interaction he had with Bell was when they were watching UFC. Edwards said that they were both in their cell at 1930. Edwards stated that they were watching UFC on tv in the cell from 2000-2100. Edwards went to sleep before 2130 and got up at 0530. He was called out to push carts and saw the lock and a shirt on the ground. Edwards said he was gone from the cell to push carts for approximately 6-7 minutes. He noticed the lock when he got back. Edwards said Bell was laying there with the sheet over his head and that Bell was not tied up. Edwards said Bell had a pair of shavers that were busted up in front of the lockers and Edwards asked him if he broke his. Bell said no and Edwards checked and saw that it was Bell's that was broken. He then put it on top of the locker. Edwards said that Bell broke his tv last night when he went to pick it up with his cast hand and it swung down and hit the corner of the desk. Edwards offered to get him a new tv on the street. Edwards advised he did not break Bell's tv. Edwards advised he has one set of nail clippers. He said that they are in his locker. Edwards advised Bell has pieces of nail clippers in his pencil box. Edwards said that the tattoo machine belongs to Bell. He advised he has never touched Bell's tattoo machine.

(*Id.*, PageID.375.)

After the investigation was completed, **Bell** was charged with felonious assault with a dangerous weapon by the Alger County Prosecuting Attorney.    (*Id.*, PageID.381-382.)    Bell was convicted of this charge after pleading guilty, and he was sentenced to a term of 10 months to 4 years.    (ECF No. 62-7, PageID.387.)    The MDOC's Offender Information Tracking System (OTIS) confirms that the date of offense for this conviction is May 31, 2020.

### G. Edwards's Misconduct Summary Report

Defendants provided Prisoner Edwards's Misconduct Summary Report. (ECF No. 62-8.)    The report indicates that Edwards was found guilty of a Misconduct for possession of a weapon as a result of the events on May 31, 2020, but was not

issued a misconduct ticket for assault.  (*Id.*, PageID.389.)   In addition, Michigan State Police did not pursue criminal charges against Edwards.[5]  (ECF No. 62-6, PageID.381.)

### H. Summary of Additional Depositions

CO Dementer testified that he only recalled Bell's assault on Edwards but had no recollection of Bell's requests to move.   (ECF No. 62-9, PageID.394.)   CO Aaron did not recall either the fight or Bell's request to move to a different cell.   (ECF No. 62-10, PageID.399.)   Warden Schroeder testified that she had no recollection of receiving a kite from Bell.   However, she explained the process she would have followed had she received a kite.   (ECF No. 62-11, PageID.404-405.)

Bell submitted the transcript from PC Salo's deposition.   In summary, Salo testified that he did not receive any kites from Bell regarding issues Bell was having with Edwards.   (ECF No. 64-4, PageID.460.)

### III.  Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

---

[5]    During the investigation, Edwards was given a polygraph test and it was determined that his answers were truthful.   (ECF No. 62-6, PageID.378.)

party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## IV.  Failure to Protect

Under the Eighth Amendment, a prison official has a duty to protect an inmate from violence caused by other prisoners.   *Wilson v. Sieter*, 501 U.S. 294, 303 (1991); *Nelson v. Overberg*, 999 F.2d 162, 165 (6th Cir. 1993); *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990); *Roland v. Johnson*, 856 F.2d 764 (6th Cir. 1988); *McGhee v. Foltz*, 852 F.2d 876, 880-81 (6th Cir. 1988).   "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."   *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (citations omitted). Recognizing that a prison official has an obligation to protect an inmate from assault by another inmate, the Supreme Court defined deliberate indifference as requiring a showing that the prison official consciously disregarded a substantial risk of serious harm to plaintiff.   *Id.* at 839.   The court stated:

> We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . .   But an official's

14

> failure to alleviate a significant risk that he should have perceived but
> did not, while no cause for commendation, cannot under our cases be
> condemned as infliction of punishment.

*Id.* at 837.    Thus, to support a claim that a prison official failed to protect a prisoner, two conditions must be satisfied: the inmate must show (1) that a substantial risk of harm was present, and (2) that the defendants, having knowledge of that risk, possessed a culpable state of mind.   *Reedy v. West,* 988 F.3d 907, 914 (6th Cir. 2021) ("An official is deliberately indifferent if he or she 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference.'")

   To support an Eighth Amendment claim, Plaintiff must establish "something more than a lack of ordinary due care, inadvertence, or error; the conduct must instead be 'obdurate' or 'wanton'--exhibiting recklessness or callous neglect."   *Id.* at 165.  *See also Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992); *Walker v. Norris*, 917 F.2d 1449 (6th Cir. 1990); *McGhee v. Foltz*, 852 F.2d 876, 881 (6th Cir. 1988). An error of judgment does not subject a prison official to liability.   *Jeffers v. Heavrin*, 10 F.3d 380, 381 (6th Cir. 1993) (errors of judgment are shielded by qualified immunity).

   In *Stewart v. Love*, 696 F.2d 43 (6th Cir. 1982), the Sixth Circuit affirmed the dismissal of a prisoner's complaint against prison officials who allegedly failed to protect him.   In that case, prison officials transferred the plaintiff for a period of six months to another prison cell after the plaintiff informed the officials that he feared

for his safety.  The plaintiff was then transferred back to his original cell.  The plaintiff informed his counselor that he feared for his safety, because he had heard rumors regarding a planned attack.  The court noted that the plaintiff made only general allegations that someone was going to hit him on the head.  The plaintiff was subsequently assaulted.  In dismissing the claim, the court found that the defendants were not deliberately indifferent to a known risk of harm to the plaintiff and concluded that the defendants, at most, were guilty of mere negligence which failed to rise to the level of an Eighth Amendment violation.

In *Reedy*, the plaintiff first spoke to his Assistant Resident Unit Supervisor about moving from his cell after his cellmate had made threats against his life.  Then he spoke to a prison counselor telling the counselor about the threats.  The counselor allegedly stated that "I'll get back with you."  988 F.3d at 910.  Six days later, plaintiff and his cellmate visited the prison counselor's office.  Reedy heard the counselor tell his cellmate "do what you got to do."  Then Reedy spoke with the counselor and responded yes to the question whether he feared for his safety.  The counselor allegedly replied that Reedy's cellmate was not going to do anything, and that if his cellmate wanted a transfer he should "hit me and I'll send him so far up north with paperwork up his . . ."  *Id.*  The prison counselor testified that he met with both Reedy and his cellmate and told them that they were adults and they needed to figure this out.  *Id.* at 911.  Then, Reedy returned to the counselor's office and stated that they had talked and everything was good.  *Id.*  Reedy was

subsequently assaulted while sleeping by his cellmate, who used a softball-sized rock in a laundry bag, causing laceration, head contusions, and seizures.  *Id*.

The Sixth Circuit affirmed the dismissal of the case because prior to the assault there was no evidence of harm to Reedy or evidence showing that he was particularly vulnerable to assault that could support the objective element.   There was no evidence of violent criminal history by plaintiff's cellmate, or evidence that he was ever involved in a physical alteration.   The Court found that conclusory statements about threats made by a cellmate without supporting facts fail to create a genuine issue of material fact.   *Id*. at 915-6.

Similarly, the Court determined that subjective element was not satisfied. The prison counselor was involved in only two conversations with Reedy, and Reedy made only vague statements about fearing for his safety and that his cellmate had threatened him.   *Id*. at 914.   The Court determined that "[s]uch brief exposure to [plaintiff's] alleged plight is not 'enough personal contact with [plaintiff] to be subjectively aware of any risk'" from his cellmate.   *Id*. (citing *Bishop v. Hackel*, 636 F.3d 757, 768-71 (6th Cir. 2011)).   Moreover, the Sixth Circuit made it clear that allegations alone are insufficient to defeat summary judgment. *Id*. "The purpose of summary judgment is to determine whether a material fact dispute exists for the jury to resolve", which is not satisfied when a plaintiff simply reasserts the conclusory allegations in the complaint with conclusory allegations in an affidavit or deposition. *Id*.   Reedy's conclusory allegations of harm were insufficient to create a material factual dispute.   Finally, the Court determined that Reedy's cellmate's statement

that if Reedy was not moved whatever happens "is going to be onto [you]" was not subjectively perceived as a threat by the counselor because the counselor believed that the cellmate was saying anything to get a different cellmate. *Id*. at 915.

     As noted above, the court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in Bell's favor.   Thus, the Court must assume that Bell and Edwards fought on May 4, 2020, which resulted in Bell's broken hand, and that Edwards assaulted Bell inside their cell on May 31, 2020. That's the starting point for the analysis.   And, as discussed above, the CIR documents injuries suffered by Bell on May 31, 2020, as well as the discovery of a padlock in a bloody sock in the cell in Edwards's area of control.   (ECF No. 62-5, PageID.329-335.)   But the issue here is what the Defendants knew, when they knew it, and whether they consciously disregarded a substantial risk of serious harm to plaintiff.   Here, the undersigned concludes that Bell has failed to present evidence creating a genuine issue of material fact as to his Eighth Amendment failure to protect claim.

     First, as required by *Reedy*, Bell has not shown that he was particularly vulnerable to assault or that Edwards had a propensity to engage in violence. Reedy, 988 F.3d, 915-6.   Bell presented no evidence which could show that he was particularly vulnerable to assault.   Further, a review of Edwards's misconduct history shows that he had never assaulted or engaged in a fight with another prisoner

or staff member in the prison system.[6]   (ECF No. 62-8 (Edwards's Misconduct Summary Report).)

Second, Bell has presented conflicting evidence regarding when he notified a Defendant that he was in a fight with Edwards and what he told each Defendant. For example, his grievance says that he first sent a kite to PC Salo on May 9, 2020, and that he sent a kite to the Warden on May 13, 2020.    (ECF No. 64-3, PageID.455.) This is inconsistent with his medical record dated May 19, 2020, when Bell stated that he broke his hand – not in a fight with another inmate – but by punching the wall on May 10, 2020.   (ECF No. 62-4, PageID.324.)   Furthermore, during his deposition, Bell confirmed that he first told someone about the fight that occurred on May 4, 2020, when he was asked by an unidentified deputy warden after he returned from his medical appointment on May 19, 2020 (*see* ECF No. 62-4, PageID.324 (medical record from examination on May 19, 2020)), whether he and his cellmate "were kind of fighting."

That portion of his deposition is shown below.

---

[6]    Bell's misconduct history, however, shows that he was found guilty of misconducts for both assault and battery of a staff member and for fighting.  (ECF No. 62-14 (Bell's Misconduct Summary Report).)

19

Page 23

```
 1    A   I know that there was a -- there was a small break
 2    because I wasn't -- you know, I wanted to see if the swelling
 3    went down, if it was fine.  I don't like to go to medical
 4    unless I had to.
 5    Q   Okay.  So whatever date it was, do you agree that you
 6    waited, you know, at least some days before seeking medical --
 7    medical attention?
 8    A   A couple, yeah.  Yeah.
 9    Q   Okay.  And I also saw in your medical records that, at
10    least according to the record, you told them when you went to
11    healthcare that you had punched the wall.  Did you tell them
12    that?
13    A   I don't recall specifically what I told them.
14    Q   Okay.  Do you know if you told them that you had been
15    fighting with Edwards?
16    A   I know -- I know -- I think the first time that I told
17    somebody that was when I was going to not medical in the
18    facility, but they -- after that set me up with an orthopedic
19    surgeon in Marquette, and I was in the control center.  You
20    know, they strip-search you and they put the shackles on you
21    and they take you on a medical run.  And while I was putting
22    my clothes back on, the -- one of the deputy wardens, kind of,
23    stopped in and was like, "Oh, hey, what whatever happened with
24    -- with you and your bunkie?  You guys were kind of fighting,
25    huh?"
```

Page 24

```
 1        And I was like, well, yeah, that was -- at that point, I
 2    had decided like, you know, let's just try to get out of this
 3    room and extricate myself.  And so I told -- I told him that I
 4    had -- that we had fought.
 5    Q   Okay.
 6    A   That was the first time I told somebody.
 7    Q   And was that the first time you were taking -- taken to
 8    an outside doctor for your hand?
 9    A   Yes, ma'am.
10    Q   Okay.  So if we got the medical records for whenever that
11    was, that would've been the day you talked to this deputy
12    warden?
13    A   Yes, ma'am.
```

(ECF 64-2, PageID.442.)

During Bell's deposition, the Assistant Attorney General reviewed how Bell communicated with each of the four remaining Defendants, when those

20

communications took place, and what was said.   First, Bell testified that he only communicated with **Warden Shroeder** by kite.   (ECF No. 62-3, PageId.312.) During the deposition, Bell did not recall the date.   Bell's testimony on what he specifically wrote to Warden Schroeder is shown below.

> 18   Q   Right.  What did you put in the kite? What did you
> 19   write?
> 20   A   I explained to her that we had already fought in the room
> 21   once, kind of put myself at risk by -- by saying that.  But I
> 22   explained to her that and I explained to her that I was trying
> 23   to get moved from the situation, just trying to do the right
> 24   thing to extricate myself from the situation, and I asked her
> 25   to – I explained to her that I hadn't been able to get any of
>
> Page 28
> 1   the other people, Aaron and the PC Salo to -- to move me.  So
> 2   I was, kind of, just trying to go up the chain and see if I
> 3   couldn't get some relief further up the chain, you know.

(*Id.*)

In the opinion of the undersigned, Bell's kite to Warden Schroeder amounted to a request for a cell transfer rather than specific notice that he faced a substantial risk of serious physical injury.   Bell's alleged communication to Warden Schroeder lacks the type of information that would be sufficient to put her on notice of the serious threat posed by Edwards.   For example, Bell does not say that Edwards had threatened him or that Edwards was violent, or dangerous, or that he had a grudge against Bell, or some reason to assault him.   *See Bishop v. Hackel*, 636 F.3d 757 (6th Cir. 2011) (objective element satisfied where small mentally slow inexperienced jail inmate was placed in cell with older inmate convicted of violent felonies, including sexual assault with a history of assaulting other inmates); *Hamilton v. Eleby*, 341 F. App'x 168, 171 (6th Cir. 2009) (objective element satisfied because threats came from

21

prison gang members who had previously assaulted plaintiff); *Green v. Bowles*, 361 F.3d 290, 294-295 (6th Cir. 2004) (objective element satisfied where vulnerable transexual inmate was housed with known predatory inmate with long misconduct history – including assaults).

Bell then testified that the first Defendant he actually notified was **CO Dementer**.   (*Id.*, PageID.313.)    Bell says that he spoke directly with Dementer and sent him a kite.    That portion of his deposition is shown below.

14   Q    Okay.  So you said you had this conversation with
15   Dementer.  Forgive me if I've asked this already, but what --
16   what do you recall telling him specifically?  As specifically
17   as you can remember.
18   A    I -- I told him that we had gotten into a fight already
19   and that I was trying to move out of the room.  I really was
20   trying to tell him, like, you know, I don't want to get in
21   trouble for this, but I'd like to just do the right thing and
22   extricate myself from the situation and get moved out of the
23   room.  But I -- I told him that we fought and I told him that
24   I was trying to move.
25   Q    Okay.  Did you tell Dementer that you were afraid that

                                                        Page 34
1    Edwards was going to attack you?
2    A    I -- I think.  I'm not 100 percent sure exactly what I
3    told him, but I -- I know that I wrote that in the kite that I
4    wrote to Aaron and -- yeah.
5    Q    Okay.
6    A    I'm not sure exactly what I said to him specifically, but
7    I know that I told him that we did already fight.
8    Q    Okay.  And other than this conversation with Dementer,
9    did you have any other contact with Dementer about trying to
10   get moved out of your cell?
11   A    Within the -- days after that, I, kind of, touched
12   back with him and -- and asked him a few times.  Like, "You
13   think now -- what do you think?  Is it possible I might be
14   able to get moved?"  And was, kind of, met with the same, "Oh,
15   well, we'll see.  We'll see, you know."  Kind of a non-
16   committal response.
17   Q    Okay.  And it -- do you remember anything specific about
18   what Dementer told you, other than, "We'll see"?
19   A    That's really all it was is, you know, "We've got to --
20   I'll see if I can't -- or if I can't figure something out for,
21   you know.  We'll see."  Kind of a standard thing they do.

(*Id.*, PageID.314.)

Again, this testimony amounts to a request to move rather than notice of an

obvious threat to Bell.

Bell also provided brief testimony on his conversation with **CO Aaron** on his request to move.

> 21  Q   And what -- to the best you can recall, what specifically
> 22  did you tell Aaron?
> 23  A   The same thing I told him, that we had fought in the room
> 24  and that I was -- that I was trying to extricate myself from
> 25  the situation and, kind of, just do the right thing and, you

> Page 37
> 1  know, find a different place to be that -- so that we didn't
> 2  have to get into it.
> 3  Q   Okay.  And to the best you can recall, what did Aaron say
> 4  to you in response to your request?
> 5  A   He basically told me that there's no -- there's no open
> 6  bunks in the unit -- currently open bunks in the unit.  And,
> 7  you know, kind of, the -- kind of, the same type of stuff.
> 8  "We'll see, I -- I'll have a talk with the PC and we'll see --
> 9  we'll see," you know, kind of, a pretty stock response.

. . . .

> 13  Q   Okay.  I think I can go back to Aaron.  So you -- you had
> 14  this conversation with Aaron a few days after your
> 15  conversation with Dementer.  Did you have any more contact or
> 16  discussions with Aaron after that about getting moved?
> 17  A   I followed up with him a couple times and asked him, and
> 18  kind of got the same responses like, "Well, we'll see, you
> 19  know, try to -- try to see" or, you know, maybe.  He also told
> 20  -- he also told me -- I believe -- I believe he also told me
> 21  to write to the warden to try to expedite the process.  And
> 22  that's when I wrote to the warden.

(*Id.*, PageID.314-315.)

And finally Bell discussed his communications with **PC Salo**, which were by kite.  Bell testified as follows:

> 19  Q   Yep.  To the best you can remember, what specifically did
> 20  you write in the kite to Salo?
> 21  A   I think when I was talking to these people, I was, kind
> 22  of, getting -- telling them the same stuff.  I was, you know,
> 23  we had already gotten into it and already fought in the room
> 24  and I was trying to avoid further -- further altercations with
> 25  him and was trying to move somewhere else.

(*Id.*, PageID.315.)

To the extent that Bell's deposition testimony differs from the allegations in his complaint, the Court must rely on his deposition testimony when assessing Defendants' motion for summary judgment.    "When a claimant's testimony contradicts the allegations in his complaint, [the court] will credit his later testimony. . . .  A claimant may not create a triable issue of fact by saying one thing in a complaint and something else in a deposition."  *Leary v. Livingston Cnty.*, 528 F.3d 438, 444 (6th Cir. 2008)

Other than Bell's deposition and his written grievance, which was prepared by Bell after the May 31, 2020 incident, there is no physical or documentary evidence – such as copies of kites or any witness statements – that add any details to Bell's account.   To his credit, Bell asked for a move to avoid trouble.   But, based on his deposition testimony, Bell did not place Defendants on notice that there existed a substantial risk of harm of a future assault from his cellmate Edwards.   Bell testified that he basically told each Defendant the same thing:   "that we had fought in the room and that I was – that I was trying to extricate myself from the situation and, kind of, just do the right thing and you know, find a different place to be that – so that we didn't have to get into it."   (ECF No. 62-3, PageID.315.)

The evidence presented by Bell was that he and Edwards had previously fought – contradicting his original story that he had punched the wall – and that he informed each of the Defendants that he wanted to transfer to a new cell because he wanted to do the "right thing" so he "didn't have to get into it."  *Id.*

In the opinion of the undersigned, Bell's evidence is simply not enough to raise a genuine issue of material fact as to the objective element of his Eighth Amendment claim because he failed to support his claim with enough facts that could have notified each Defendant of a substantial risk of harm.  *Reedy*, 988 F.3d at 913-914 (a plaintiff must adduce "competent summary judgment evidence containing some further factual enhancement of any threat from [another inmate]").

Second, there exists no genuine issue of material fact supporting the subjective element of Bell's Eighth Amendment claim – that each Defendant perceived the risk to Bell and then acted with a culpable state of mind.

Bell says that the first person he spoke with was CO Dementer after he returned from his May 19, 2020 medical visit.   Bell says that he requested a transfer because he knew that CO Dementer made "friendly moves" for other prisoners. (ECF No. 62-3, PageID.313.)   CO Dementer allegedly stated: "We'll see."  (*Id.*, PageID.314.)   CO Dementer testified that he did not remember speaking with Bell regarding a fight or a request for a cell transfer.   (ECF No. 62-9, PageID.394 (Dementer deposition transcript).) CO Dementer testified that prior to the May 31, 2020, incident he did not "believe that Bell was at risk of physical injury from Edwards."  (*Id.*, PageID.395.)

26

Bell says that he spoke with CO Aaron a couple of days after he had spoken to CO Dementer about his need to transfer to a new cell.   (ECF No. 62-3, PageID.314.) Bell says that CO Aaron gave him a similar response of either we'll see, try to see, or maybe.  (*Id*., PageID.315.)   CO Aaron testified that he did not recall speaking with Bell, but that if he had spoken with him about transferring to a new cell he would have told him to kite the ARUS, but if Bell told him he had a fight with his cellmate he would have placed Bell in segregation and informed the shift command to get involved.  (ECF No. 62-10, PageID.399 (Aaron deposition transcript).)   CO Aaron further testified that he would have remembered if Bell had told him he had been assaulted, because he would have "pulled him aside, and shift command would have been involved" by interviewing Bell.  (*Id*.)

Bell says that although he never spoke with PC Salo or Warden Schroeder about his request for a transfer, he sent them kites to explain his need for a transfer to a new cell.  (ECF No. 62-3, PageID.18, 317.)   Again, there are no copies of kites in the record.   Both PC Salo[7] and Warden Schroeder testified that they never received kites from Bell and that they were never aware that Bell and Edwards were involved in a fight on May 4, 2020.   PC Salo testified that he never received a kite from Bell "[b]ecause 100 percent of the time when prisoners requested to be moved and it was an emergency situation, I acted on that."   (ECF No. 62-2, PageID.293 (Salo deposition transcript).)   Warden Schroeder testified that if she had received a

---

[7]    PC Salo retired from his prison job a couple of days before the May 31, 2020, incident.  (ECF No. 62-2, PageID.293.)   He states that he first learned of the May 31, 2020, incident when he received the complaint in this lawsuit.  (*Id*.)

kite from Bell, she would have contacted the Resident Unit Manager of Bell's housing unit, the Assistant Deputy Warden, or the PC to let them know about the kite so that they could call Bell out for an interview.    (ECF No. 62-11, PageID.404-405 (Schroeder deposition transcript.)   Since that did not happen, she testified that "I would have to say I did not receive a kite."   (*Id.*, PageID.405.)

In the opinion of the undersigned, there exists no genuine issue of material fact that Defendants perceived that Edwards was a threat to Bell's safety and that they each ignored the threat and acted with a culpable state of mind.    Bell has presented no evidence otherwise.   Allegations or conclusory evidence fail to create a genuine issue of material fact.   *Reedy*, 988 F.3d at 914.   As the Sixth Circuit explained, "[t]he purpose of summary judgment is to determine whether a material fact dispute exists for the jury to resolve, not to replace conclusory allegations of the complaint or answer with conclusory allegations in an affidavit, verified complaint, or deposition." *Id.* (cleaned up).

## V.   Qualified Immunity

Defendants further argue that they are entitled to dismissal of the complaint based upon qualified immunity.    "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).    Once a defendant raises the qualified

immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   The analysis entails a two-step inquiry.   *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).   First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)).   Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it."   *Id.* (citing *Pearson*, 555 U.S. at 232).   A court may address these steps in any order.   *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if either step of the analysis is not satisfied.   *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first step of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred.   *Graham v. Connor*, 490 U.S. 386, 394 (1989).   The court considers the state of the law at the second step.   As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate."   *White v. Pauly*, 580 U.S. 73, 79 (2017)

(internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*,

577 U.S. 7, 11 (2015)).    As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear
> foundation in then-existing precedent. The rule must be "settled law,"
> *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589
> (1991) (per curiam), which means it is dictated by "controlling authority"
> or a robust 'consensus of cases of persuasive authority,' " *al–Kidd*,
> *supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S.
> 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that
> the rule is suggested by then-existing precedent. The precedent must be
> clear enough that every reasonable official would interpret it to establish
> the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at
> 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every
> reasonable official" would know. *Id*., at 664, 132 S.Ct. 2088 (internal
> quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle
> clearly prohibit the officer's conduct in the particular circumstances
> before him. The rule's contours must be so well defined that it is "clear
> to a reasonable officer that his conduct was unlawful in the situation he
> confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150
> L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix
> v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015)
> (per curiam). We have repeatedly stressed that courts must not "define
> clearly established law at a high level of generality, since doing so avoids
> the crucial question whether the official acted reasonably in the
> particular circumstances that he or she faced." *Plumhoff*, *supra*, at 2023
> (internal quotation marks and citation omitted). A rule is too general if
> the unlawfulness of the officer's conduct "does not follow immediately
> from the conclusion that [the rule] was firmly established." *Anderson*,
> *supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the
> rule must obviously resolve "whether 'the circumstances with which [the
> particular officer] was confronted ... constitute[d] probable cause.'"
> *Mullenix*, *supra*, at 309 (quoting *Anderson*, *supra*, at 640–641, 107 S.Ct.
> 3034; some alterations in original).

*D.C. v. Wesby*, 583 U.S. 48, 63-64 (2018).

In the qualified immunity context, if the facts alleged and evidence produced,

viewed in the light most favorable to the plaintiff, would permit a reasonable juror to

find that the officer violated a clearly established constitutional right, dismissal by summary judgment is inappropriate.  *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020) (citing *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009)).

For the reasons set forth above, it is recommended that the Court find that no genuine issue of material fact exists which can support Bell's claim that each Defendant failed to protect him from a substantial risk of harm.  Bell has failed to present factual evidence which could establish that each Defendant subjectively perceived that Edwards presented a threat to Bell's safety.  *Reedy*, 988 F.3d at 915. Nor has Bell placed any evidence into the record showing that he belonged to a class of inmates that were "particularly vulnerable to assault."  *Id.*  Further, there exists no evidence that Edwards had a propensity for violence, that he had assaulted anyone, or that he has any history of fighting in the prison.  *Id*.

Finally, there is no evidence that any Defendant perceived an obvious substantial risk to Bell's safety or any evidence of a substantial risk that was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past."  *Id*. at 916 (citing *Farmer*, 511 U.S. at 842.)  Qualified immunity is appropriate for prison officials based upon inmate's failure to protect claim resulting in injuries from a surprise attack by another inmate.  *Morris v. Ward*, No. 4:06-cv-13, 2007 WL 951433, *1 (W.D. Mich. Mar. 27, 2007).  Where corrections officers have knowledge of a previous altercation with other prisoners before the plaintiff requested a transfer because he feared for his life, the officers were entitled to dismissal on plaintiff's failure to protect claim because plaintiff "did not tell them

that he had actually been threatened with future violence." *Klebanowski v.*

*Sheahan*, 540 F.3d 633 (7th Cir. 2008)[8]  (plaintiff's speculation of a threat based upon

a first attack is insufficient to establish a failure to protect cause of action).

Similarly, although Bell asserts that he notified each Defendant that he and Edwards

engaged in a fight, Bell did not present any evidence that Edwards had threatened

him with future harm.   Crediting Bell's version of the facts, Bell failed to provide

Defendants with information that could enable them to believe that Edwards was a

threat to Bell.

In the opinion of the undersigned, Defendants are entitled to qualified

immunity on Bell's claims, because there exists no genuine issue of material fact as

to whether each Defendant perceived a substantial risk of harm to Bell and callously

ignored that risk in violation of the Eighth Amendment.

### VI.  Sovereign Immunity

Bell sues Defendants in both their individual and official capacities.   A

lawsuit against a state official for monetary damages is treated as a lawsuit against

the State.   *Brandon v. Holt*, 469 U.S. 464, 471 (1985).   The states and their

departments are immune under the Eleventh Amendment from suit in the federal

courts unless the state has waived immunity or Congress has expressly abrogated

Eleventh Amendment immunity by statute.   *See Pennhurst State Sch. & Hosp. v.*

*Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978);

---

[8]     Applying a deliberate indifference standard to a pre-trial detainee's Fourteenth
Amendment claim against the individual defendants.   *Klebanowski*, 540 F.3d at 639.

*O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993).  Section 1983 did not expressly abrogate Eleventh Amendment immunity, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of Michigan has not consented to civil rights suits in federal court, *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).  As such, it is the undersigned's opinion that Bell's claims against Defendants in their official capacity for monetary damages are properly dismissed in accordance with the Eleventh Amendment.

### VII.  State Law Claims

In his complaint, Bell asserted that Defendants' conduct amounted to gross negligence under Michigan state law.  In determining whether to retain supplemental jurisdiction over state law claims, "[a] district court should consider the interests of judicial economy and the avoidance of multiplicity of litigation and balance those interests against needlessly deciding state law issues." *Landefeld v. Marion Gen. Hosp., Inc.*, 994 F.2d 1178, 1182 (6th Cir. 1993).  Ordinarily, when a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the court will dismiss the remaining state-law claims. *Id.*  Dismissal, however, remains "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (citing 28 U.S.C. § 1367(c)); *Orton v. Johnny's Lunch Franchise, LLC*, 668 F.3d 843, 850 (6th Cir. 2012).

If the Court adopts the undersigned's recommendation, it will dismiss all of Bell's federal law claims.   The balance of the relevant considerations would therefore

weigh against the exercise of supplemental jurisdiction.   As such, the undersigned respectfully recommends that the Court decline to exercise supplemental jurisdiction over Bell's state law claims.

## VIII.   Recommendation

Accordingly, it is respectfully recommended that the Court grant Defendants' motion for summary judgment and dismiss this case.

NOTICE TO PARTIES:   Objections to this Report and Recommendation must be served on opposing parties and filed with the Clerk of the Court within fourteen (14) days of receipt of this Report and Recommendation.   28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b); W.D. Mich. LCivR 72.3(b).   Failure to file timely objections constitutes a waiver of any further right to appeal.   *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).   *See also Thomas v. Arn*, 474 U.S. 140 (1985).


Dated:    June 20, 2025                     /s/ *Maarten Vermaat*
                                            MAARTEN VERMAAT
                                            U.S. MAGISTRATE JUDGE

34